POMERANTZ LLP
Gustavo F. Bruckner
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEPHEN LAWLESS, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| AURORA CANNABIS INC., MICHAEL SINGER, and GLEN IBBOTT, | |
| Defendants. | |

Plaintiff Stephen Lawless ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

1

Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Aurora Cannabis Inc. ("Aurora" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Aurora securities between February 13, 2020, and September 4, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Aurora is headquartered in Edmonton, Canada.  The Company produces and distributes medical cannabis products worldwide.  It is vertically integrated and horizontally diversified across various segments of the cannabis value

2

chain, including facility engineering and design, cannabis breeding, genetics research, production, derivatives, high value-add product development, home cultivation, wholesale, and retail distribution.

3. In 2018, the Canadian government approved the Cannabis Act, which legalized and regulated the use of recreational cannabis. In response to the statute's approval, and the corresponding surge of the recreational cannabis industry, Aurora completed a series of acquisitions to expand the Company's presence and increase its distribution, including the Company's all-share purchase of the Canadian medical cannabis producer MedReleaf for total consideration of 3.2 billion Canadian dollars. Like many other companies in the cannabis industry, however, the Company encountered a variety of difficulties as the industry surged, including, *inter alia*, overproduction, regulatory delays, and competition from the black market.

4. On February 6, 2020, shortly before the start of the Class Period, Aurora issued a press release announcing, *inter alia*, a "business transformation plan," to "better align the business financially with the current realities of the cannabis market in Canada while maintaining a sustainable platform for long-term growth." Specifically, the press release touted that the plan was "expected to include significant and immediate decreases in selling, general & administrative ("SG&A") expenses and capital investment plans."

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Aurora had significantly overpaid for previous acquisitions and experienced degradation in certain assets, including its production facilities and inventory; (ii) the Company's purported "business transformation plan" and cost reset failed to mitigate the foregoing issues; (iii) accordingly, it was foreseeable that the Company would record significant goodwill and asset impairment charges; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.     On September 8, 2020, Aurora issued a press release "announc[ing] an update on its business operations along with certain unaudited preliminary fiscal fourth quarter 2020 results."   Among other things, Aurora announced that the Company expected to record up to $1.8 billion in goodwill impairment charges in the fourth quarter of 2020.   The Company also announced that "previously announced fixed asset impairment charges[ were] now expected to be up to $90 million, due to production facility rationalization, and a charge of approximately $140 million in the carrying value of certain inventory, predominantly trim, in order to align inventory on hand with near term expectations for demand."

4

7.    On this news, Aurora's stock price fell $0.99 per share, or 11.63%, to close at $7.52 per share on September 8, 2020.

8.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  Pursuant to Aurora's most recent annual report on Form 40-F, as of June 30, 2019, there were a total of 1,017,438,744 Aurora common shares outstanding. Aurora's common shares trade on the New York Stock Exchange ("NYSE"). Accordingly, there are presumably hundreds, if not thousands, of investors in Aurora's common shares located within the U.S., some of whom undoubtedly reside in the State of New Jersey.

12.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.    Plaintiff, as set forth in the attached Certification, acquired Aurora securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.    Defendant Aurora is organized under the laws of British Columbia, Canada, with principal executive offices located at 500 - 10355 Jasper Avenue, Edmonton, Alberta, T5J 1Y6, Canada.  Aurora securities trade in an efficient market on the NYSE and the Toronto Stock Exchange ("TSX") under the symbol "ACB."

15.    Defendant Michael Singer ("Singer") served as Aurora's Interim Chief Executive Officer ("CEO") from February 6, 2020, until September 8, 2020.  Singer is also the Company's Executive Chairman of the Board of Directors.

16.    Defendant Glen Ibbott ("Ibbott") has served as Aurora's Chief Financial Officer at all relevant times.

17.    Defendants Singer and Ibbott are sometimes referred to herein as the "Individual Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of Aurora's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Aurora's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Aurora, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

19.     Aurora and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Aurora is headquartered in Edmonton, Canada.  The Company produces and distributes medical cannabis products worldwide.  It is vertically integrated and horizontally diversified across various segments of the cannabis value chain, including facility engineering and design, cannabis breeding, genetics

research, production, derivatives, high value-add product development, home cultivation, wholesale, and retail distribution.

21.     In 2018, the Canadian government approved the Cannabis Act, which legalized and regulated the use of recreational cannabis.  In response to the statute's approval, and the corresponding surge of the recreational cannabis industry, Aurora completed a series of acquisitions to expand the Company's presence and increase its distribution, including the Company's all-share purchase of the Canadian medical cannabis producer MedReleaf for total consideration of 3.2 billion Canadian dollars. Like many other companies in the cannabis industry, however, the Company encountered a variety of difficulties as the industry surged, including, *inter alia*, overproduction, regulatory delays, and competition from the black market.

22.     On February 6, 2020, shortly before the start of the Class Period, Aurora issued a press release announcing, *inter alia*, a "business transformation plan," to "better align the business financially with the current realities of the cannabis market in Canada while maintaining a sustainable platform for long-term growth." Specifically, the press release touted that the plan was "expected to include significant and immediate decreases in selling, general & administrative ("SG&A") expenses and capital investment plans."

## **Materially False and Misleading Statements Issued During the Class Period**

23.     The Class Period begins on February 13, 2020, when the Company filed with the SEC, appended as an exhibit to a Form 6-K, Aurora management's discussion and analysis for the second quarter of 2020 (the "Q2 2020 MD&A").  In providing a business overview, the Q2 2020 MD&A stated, in relevant part, "[t]he Company has grown both organically and *via strategic acquisitions* with the vision of creating a world-class cultivation platform producing consistent high-quality cannabis for both the global medical and the Canadian consumer use markets." (Emphasis added.)

24.     With respect to impairments, the Q2 2020 MD&A stated, in relevant part:

**Impairment**

During Q2 2020, the Company recorded a $762.2 million impairment charge to goodwill, a $158.7 million impairment charge to definite life and indefinite life intangible assets, and a $51.9 million impairment charge to property, plant and equipment. The impairment charges are allocated to the Company's cannabis operating segment. Impairment charges recognized during the period were primarily attributable to changes in the timing of accessing market demand and the resulting slower revenue ramp and growth than originally forecasted by management. In addition, management has undertaken certain strategic initiatives to realign the Company's footprint to meet market demand, thus making certain assumptions used to derive goodwill from prior acquisitions no longer relevant to the Company's current and future operating plans.

25.    Further, with respect to the Company's business transformation plan, the Q2 2020 MD&A stated, in relevant part:

**Business Transformation Plan**

On February 6, 2020, we announced a business plan to align SG&A and capital expenditures with current market conditions. It is our intention to manage the business to a target SG&A range of $40.0 million to $45.0 million per quarter by the end of the fiscal fourth quarter of 2020. To achieve this, management plans to focus the business on its core areas: (i) Canadian consumer market; (ii) Canadian medical market; (iii) established international medical markets; and (iv) U.S. market initiatives. In addition, the Company has eliminated close to 500 full-time equivalent staff across the company, including approximately 25% of corporate positions. The associated severance costs associated with the restructuring plan are estimated to be $2 million to $4 million which are anticipated to impact the Company's fiscal third quarter ending March 31, 2020. Additionally, management is restructuring spending plans on information technology projects, sales and marketing initiatives, travel and entertainment, professional services, and other non-revenue-generating third party costs, which do not provide an immediate impact to earnings.

We also intend to reduce capital expenditures for the second half of fiscal 2020 to bring capital expenditures below $100.0 million in total. Management is evaluating all capital projects underway and is making decisions with respect to continuing or terminating further investment in each. Future capital allocation decisions will be scrutinized through a lens of optimizing near-term investor returns.

26.    In addition, with respect to liquidity and capital resources, the Q2 2020 MD&A stated, in relevant part:

***In an effort to rationalize capital expenditures to align with market demand, reduce near term debt and bolster liquidity***, the Company has taken the following steps to re-position Aurora for long term success:

10

- In November 2019, the Company announced that it had ceased construction of its Aurora Nordic 2 facility in Denmark and deferred spending on construction and commission costs for its Aurora Sun facility. These initiatives are expected to conserve approximately $200.0 million of cash in the near term.
- On November 25, 2019, the Company reduced its near term debt obligations when holders of $227.0 million principal amount, or approximately 99%, of the Company's Debentures voluntarily elected to convert their Debentures pursuant to the Early Amended Conversion Privilege (the "Elected Debentures"). Under the terms of the Supplemental Indenture, the Elected Debentures were converted into common shares of the Company (the "Common Shares") at the Amended Early Conversion Price (as defined in the Supplemental Indenture) of $3.2837 resulting in the issuance of an aggregate of 69,135,117 Common Shares. As of December 31, 2019, $2.3 million principal amount of these Debentures remain outstanding, subject to the original terms and conditions. For more information, refer to Note 13(i) of the Financial Statements for the three and six months ended December 31, 2019.
- In November 2019, the Company listed its Exeter property for sale for $19.0 million through Cushman & Wakefield.
- In February 2020, the Company announced a restructuring plan that includes plans to reduce operating expenses and further streamline capital investments. These actions are expected to reset SG&A expenses to approximately $40 million to $45 million by the end of the Company's fiscal fourth quarter ending June 30, 2020.

***These initiatives are expected to provide the Company with increased liquidity and flexibility to meet its financial commitments***, including its near- term obligations of $373.6 million[.]

(Emphasis added.)

27.     Finally, with respect to internal controls over financial reporting, the

Q2 2020 MD&A stated, in relevant part:

In accordance with National Instrument 52-109 Certification of Disclosure in Issuers' Annual and Interim Filings, management is responsible for establishing and maintaining Disclosure Controls and Procedures ("DCP") and Internal Control Over Financial Reporting ("ICFR"). The Company's management, including the CEO and the Chief Financial Officer ("CFO"), has designed the DCP and ICFR based on the 2013 Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with IFRS.

\*\*\*

An evaluation of the effectiveness of the Company's disclosure controls and procedures was conducted under the supervision of the Company's management, including the CEO and the CFO. Based on this evaluation, the CEO and the CFO concluded that the Company's disclosure controls and procedures were effective in providing reasonable assurance that material information relating to the Company is made known to them and information required to be disclosed by the Company is recorded, processed, summarized and reported within the time periods specified in such legislation.

There were no significant changes in Aurora's ICFR during the period covered by this MD&A that materially affected, or are reasonably likely to materially affect, the Company's ICFR, except to the extent they relate to internal controls of acquired entities. However, management has also performed additional account reconciliations and other analytical and substantive procedures to ensure reliable financial reporting and the preparation of financial statements in accordance with IFRS.

28.     Also appended to the February 13, 2020 Form 6-K as exhibits were signed certifications by the Individual Defendants, attesting, *inter alia*:

1.     ***Review***: I have reviewed the interim financial report and interim MD&A (together, the "interim filings") of Aurora Cannabis Inc. (the "issuer") for the interim period ended December 31, 2019.

12

2. ***No misrepresentations***: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

29.    That same day, Aurora hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the second quarter of 2020 (the "Q2 2020 Earnings Call").  On the Q2 2020 Earnings Call, Defendant Ibbott stated, in relevant part:

We also used CAD 45 million in restricted cash to pay down our debt and thereby reduce debt servicing costs. And finally, we downsize the total facility by CAD 96.5 million sort of the elimination of facility fee, which had been earmarked specifically for the construction of Aurora Sun. When we reduced the scope of Aurora Sun significantly, facility being no longer available nor unnecessary.

I should emphasize that we saw both actions as net positives for the company's financial position. Staying with the balance sheet, you'll note that we've finalized the goodwill and intangible and PP&E asset impairments in our Q2 financial statements, totaling CAD 762 million for goodwill and CAD 210 million for intangible and PP&E asset impairments; both within our previously disclosed ranges.

Turning to liquidity, as at December 31, 2019 our consolidated cash position was CAD 156 million excluding the CAD 45 million of restricted cash. We had used our aftermarket financing program and had raised gross proceeds of CAD 325 million in the period from July to December 2019. We have roughly CAD 200 million remaining under the existing ATM program.

30.    Further, when asked about Aurora's inventory balance in light of the surge of dried cannabis, Defendant Ibbott responded, in relevant part:

13

Well yes, it's been an issue since the sort of the middle of last year, I guess people look to across inventory in the industry in particular, what are the comprised of, how much is at risk, it's just definitely a differentiation between the quality, we'll say that it was there that's defined by the consumer's experience or the levels of THC, whatever, quality cannabis and just think what is a significant amount of lower quality cannabis destined for extraction in the industry. That's a bit of a challenge.

When we look at our inventory is extended to December 31, we definitely even under– I'd say relatively pessimistic scenarios. We will be consuming all of that over the next several quarters. ***So we're not concerned about our inventory assets. There was a question earlier about a level of the productions, something that we're watching. It will depend on how our demand plan develops, but we don't have any particular issues in our inventory, as it stand*** [sic] ***at December, 31.***

(Emphasis added.)

31.    On April 13, 2020 Aurora issued a press release entitled, "Aurora Cannabis Provides Update on Initiatives to Strengthen Liquidity, Business Transformation Plan and COVID-19 Operational Response," which touted, in relevant part:

**Business Transformation Update:**

Aurora has provided an update on its business transformation plan as previously announced in February 2020. The Company stated that:

- Aurora remains on track with its previously announced business transformation targets, including: (1) material selling, general and administrative cost reductions; (2) significant reductions in capital expenditures; and (3) reducing complexity across the organization;

14

- Aurora today reaffirmed its previous commentary that fiscal Q3 2020 cannabis net revenue is expected to show modest growth relative to fiscal Q2 2020; and

- Aurora today announced that its Board of Directors has approved, subject to required regulatory and stock exchange approvals, a plan to consolidate all of its outstanding Common Shares on the basis of 1 Common Share for every 12 Common Shares currently outstanding (the "**Consolidation**"), with such Consolidation to be effective on or about May 11, 2020. The Company expects the Consolidation to restore compliance with the NYSE's continued listing standards, and to provide access to a broad universe of investors, access to equity capital and trading liquidity. Further details regarding the Consolidation can be found below under the heading "Information Regarding the Share Consolidation Plan".

"Our focus today continues to be on financial discipline across the entire organization.  We are taking appropriate actions to strengthen our cash position and maintain financial flexibility as we navigate through the current environment," said Michael Singer, Executive Chairman and Interim CEO. "As Aurora drives towards generating positive free cash-flow, we are confident that our shareholders will be supportive of our further actions to solidify our balance sheet and position the Company for success."

32.     On April 16, 2020, Aurora filed a voluntary prospectus supplement on Form SUPPL with the SEC, supplementing the Company's short form base shelf prospectus dated May 10, 2019 (the "April 16, 2020 Supplement").  In describing the Company, the April 16, 2020 Supplement stated, in relevant part:

*The Company has grown, both organically and via strategic acquisitions*, with the vision of creating a world-class cultivation platform producing high quality, consistent cannabis for both the global medical and Canadian consumer use markets. Underpinning this vision is the Company's differentiated purpose-built growing facilities, which we believe are the most technologically advanced indoor agricultural

growing facilities in the world. These facilities consistently produce high-quality cannabis at scale and aim to lower the risk of crop failure, which allows the Company to lower per-unit production costs. We also recognize the need for robust research into the myriad of potential medical uses of cannabis and, as such, have built a leading plant and human science team.

With operations established in the Canadian market, the Company has strategically allocated resources to growing its international footprint to address the growing number of countries legalizing medical cannabis use around the world.

(Emphasis added.)

33.    Further, the April 16, 2020 Supplement included a "corporate update,"

which indicated, in relevant part:

The Company remains on track with its previously announced business transformation targets, including: (1) material selling, general and administrative cost reductions; (2) significant reductions in capital expenditures; and (3) reducing complexity across the organization. In addition, the Company has reaffirmed its previous commentary that cannabis net revenue for the quarter ended March 31, 2020 is expected to show modest growth relative to the quarter ended December 31, 2019. As of March 31, 2020, the Company had approximately $205 million of cash. This includes all amounts raised under the Company's now completed US$400 million At-the-Market Offering program ("ATM"), initially announced in May 2019.

34.    On May 14, 2020, Aurora hosted an earnings call with investors and

analysts to discuss the Company's financial and operating results for the third quarter

of 2020 (the "Q3 2020 Earnings Call").  On the Q3 2020 Earnings Call, Defendant

Singer touted, in relevant part:

We are pleased with the progress we made on our business transformation plan that we announced in February. As a reminder, that

plan detailed our intention to better align the business financially with the realities of the current cannabis market in Canada. Success here will allow us to conserve resources and still position Aurora to build a sustainable growth platform longer term. As part this reset, we committed to an SG&A run rate of CAD$40 million to CAD$45 million per quarter by the end of the fiscal fourth quarter of 2020, and also stated our intention to reduce capital expenditures for the second half of fiscal 2022 to below CAD$100 million.

\*\*\*

In summary, since announcing the business transformation plan at the beginning of February, the team at Aurora has taken a number of concrete steps to put the Company firmly on track to meet or exceed our previously announced targets. These steps are designed to strengthen Aurora's balance sheet and reduce go-forward costs, to fuel profitability and positive cash flow. And while revenues in this current operating environment can be difficult to predict, we believe that our cost levers at our disposal to put us on a path to be EBITDA positive in Q1. We remain optimistic about our future growth potential in Canada and international.

35.     Further, when asked about Aurora's inventory versus its sales,

Defendant Ibbott responded, in relevant part:

So, as we look forward and project with those new efficiencies in place in terms of the type of product we're taking out of the organization, we see that there will -- we will get into that steady cadence of the volume sold versus the volume being produced on the top quality flower over the next couple of quarters and continue to drive down on that part of the inventory. For the stuff that goes in, into other products and sometimes it just may be still a smoke product or pre-roll, there is still quality but maybe smaller buds or trim. That'll take a couple more quarters to draw down the inventory and gain cadence. But, a lot of that will be related to the growth of 2.0 products as well.

So, we're satisfied with where we are at on that and paying close attention to it.

17

36.     On May 15, 2020, the Company filed with the SEC, appended as an exhibit to a Form 6-K, Aurora management's discussion and analysis for the third quarter of 2020 (the "Q3 2020 MD&A").  The Q3 2020 MD&A included a business transformation update, which stated, in relevant part:

> On February 6, 2020, the Company announced a business transformation plan intended to better align the business financially with the current realities of the cannabis market in Canada while maintaining a sustainable platform for long-term growth. These actions included a significant reduction in selling, general & administrative ("SG&A") expenses and capital investment plans.
>
> Management committed to reset the Company to an SG&A run rate, including research and development ("R&D"), of $40 million to $45 million per quarter by the end of the fiscal fourth quarter of 2020 by focusing the business on its core areas: 1) Canadian consumer market; 2) Canadian medical market; 3) established international medical markets; and 4) U.S. market initiatives. Management also stated its intention to reduce cash capital expenditures for the second half of fiscal 2020 to below $100 million in total through a detailed evaluation of all capital projects underway through a lens of optimizing near-term investor returns.

37.     Further, in listing the Company's financial highlights, the Q3 2020 MD&A stated, in relevant part:

> **Impairment**
>
> During Q3 2020, the Company recorded a $7.4 million impairment charge to property, plant and equipment and a $2.4 million impairment charge to right-of-use assets associated with the Canadian Hemp Cash Generating Unit ("CGU"). The impairment charges are allocated to the Company's cannabis operating segment. Impairment charges during the period were primarily attributable to slower than initially expected sales and profitability for the Canadian Hemp CGU.

***

Additionally, the Company also recognized an impairment charge of $28.2 million on its investments in associates to reflect current market values, and a $9.6 million write-down on the Exeter property, acquired as part of the MedReleaf transaction, which the Company has accepted an offer to sell for $9.0 million.

***

**Business Transformation Plan**

On February 6, 2020, we announced a business plan to align SG&A and capital expenditures with current market conditions. Management is currently working towards reducing SG&A to a target SG&A range of $40.0 million to $45.0 million per quarter by the end of the fiscal fourth quarter of 2020. To achieve this, management has focused the business on its core areas: (i) Canadian consumer market; (ii) Canadian medical market; (iii) established international medical markets; and (iv) U.S. market initiatives. As part of the transformation plan, the Company eliminated close to 500 full-time equivalent staff across the company, including approximately 25% of corporate positions. Management is also re-evaluating spending plans on information technology projects, sales and marketing initiatives, travel and entertainment, professional services, and other non-revenue-generating third party costs, which do not provide an immediate impact to earnings. We have also reduced capital expenditures to below $100 million in the second half of fiscal 2020.

38.    In addition, with respect to liquidity and capital resources, the Q3 2020

MD&A stated, in relevant part:

*In an effort to manage liquidity prudently while the Company moves toward profitability and positive cash flow*, Aurora has taken the following steps to re-position Aurora for long term success:

- In November 2019, the Company announced that it had ceased construction of its Aurora Nordic Sky facility in Denmark and deferred spending on construction and commission costs for its Aurora Sun facility.

- On November 25, 2019, the Company reduced its near term debt obligations when holders of $227.0 million principal amount, or approximately 99%, of the Company's Debentures voluntarily elected to convert their Debentures pursuant to the Early Amended Conversion Privilege (the "Elected Debentures"). Under the terms of the Supplemental Indenture, the Elected Debentures were converted into common shares of the Company (the "Common Shares") at the Amended Early Conversion Price (as defined in the Supplemental Indenture) of $39.40 resulting in the issuance of an aggregate of 5,761,260 Common Shares. The remaining $2.3 million principal amount of these Debentures were repaid in cash in Q3 2020. For more information, refer to Note 14(i) of the Financial Statements for the three and nine months ended March 31, 2020.
- In February 2020, the Company announced a restructuring plan to reduce operating expenses and further streamline capital investments. These actions are expected to reset SG&A expenses to approximately $40 million to $45 million at the beginning of fiscal Q1 2021.
- In April 2020, the Company accepted an offer to sell its Exeter property for gross proceeds of $9.0 million. The sale is subject to customary closing conditions and is expected to be finalized during May 2020. The Company also accepted an offer to sell its Jamaica property for gross proceeds of US$3.4 million.
- In April 2020, the Company sold 5,302,227 common shares of EnWave Corporation at $0.80 per share for net proceeds of $4.1 million.
- On April 16, 2020, the Company filed a second At-the-Market ("ATM") supplement to its existing Shelf Prospectus (described below), which provides for an additional US$250.0 million in common shares to be sold by the executing sales agents at market prices, thus increasing the total available financing under the ATM from US$400.0 million to US$650.0 million.
- On May 11, 2020, the Company completed a twelve-for-one (12:1) Share Consolidation. The Share Consolidation is expected to restore compliance with the NYSE's continued listing standards and provide access to a broad universe of investors, equity capital and trading liquidity.

> ***These initiatives are expected to provide the Company with increased liquidity and flexibility to meet its financial commitments***, including its near- term obligations of $254.2 million[.]

(Emphasis added.)

39.     Finally, with respect to internal controls over financial reporting, the

Q3 2020 MD&A stated, in relevant part:

> There were no significant changes in Aurora's internal controls over financial reporting ("ICFR") during the period covered by this MD&A that materially affected, or are reasonably likely to materially affect, the Company's ICFR, except to the extent they relate to internal controls of acquired entities. Management continues to perform additional account reconciliations and other analytical and substantive procedures to ensure reliable financial reporting and the preparation of financial statements in accordance with IFRS.

40.     Also appended to the May 15, 2020 Form 6-K as exhibits were signed

certifications by the Individual Defendants, attesting, *inter alia*:

> 1.     ***Review***: I have reviewed the interim financial report and interim MD&A (together, the "interim filings") of Aurora Cannabis Inc. (the "issuer") for the interim period ended March 31, 2020.

> 2.     ***No misrepresentations***: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

41.     On May 28, 2020, Aurora filed a voluntary prospectus supplement on

Form SUPPL with the SEC, supplementing the Company's short form base shelf

prospectus dated May 10, 2019 (the "May 28, 2020 Supplement").  In describing the

Company, the May 28, 2020 Supplement stated, in relevant part:

> **The Company has grown, both organically and via strategic acquisitions**, with the vision of creating a world-class cultivation platform producing high quality, consistent cannabis for both the global medical and Canadian consumer use markets. Underpinning this vision is the Company's differentiated purpose-built growing facilities, which we believe are the most technologically advanced indoor agricultural growing facilities in the world. These facilities consistently produce high-quality cannabis at scale and aim to lower the risk of crop failure, which allows the Company to lower per-unit production costs. We also recognize the need for robust research into the myriad of potential medical uses of cannabis and, as such, have built a leading plant and human science team.
>
> With operations established in the Canadian market, the Company has strategically allocated resources to growing its international footprint to address the growing number of countries legalizing medical cannabis use around the world.

(Emphasis added.)

42.     On June 23, 2020, Aurora issued a press release which provided updates

on its business transformation plan.  The press release stated, in relevant part:

> "Across our organization we continue to take decisive action and execute on our previously announced Business Transformation Plan," stated Michael Singer, Executive Chairman and Interim CEO of Aurora. "With today's announcement we have achieved our stated SG&A run-rate target and expect to operate at approximately $42 million for the first quarter of fiscal 2021. The further cost savings and margin improvement to be realized from our facility rationalization plan is another example of our commitment to deliver greater efficiency throughout the business."
>
> Mr. Singer further elaborated, "This has not simply been a cost cutting exercise. We have undertaken a strategic realignment of our operations

to protect Aurora's position as a leader in key global cannabinoid markets, most notably Canada. Both the Canadian facility rationalization and inventory revaluation are expected to improve gross margins and accelerate our ability to generate positive cash flow. We believe that we now have the right balance for the long-term success of Aurora – market leadership, financial discipline, operational excellence, and strong execution. We remain focused on making Aurora a profitable and robust global cannabinoid company."

Since announcing the Business Transformation Plan, Aurora has taken a number of concrete steps that position the Company to meet or exceed the previously announced Selling, General and Administrative (SG&A) cost target of $40 to $45 million, including R&D, as the Company exits Q4 2020.

43.    The statements referenced in ¶¶ 23-42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Aurora had significantly overpaid for previous acquisitions and experienced degradation in certain assets, including its production facilities and inventory; (ii) the Company's purported "business transformation plan" and cost reset failed to mitigate the foregoing issues; (iii) accordingly, it was foreseeable that the Company would record significant goodwill and asset impairment charges; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

44.    On September 8, 2020, Aurora issued a press release "announc[ing] an update on its business operations along with certain unaudited preliminary fiscal fourth quarter 2020 results."  Specifically, Aurora announced, in relevant part:

Impairment Charges

As previously announced, and as part of the business transformation and cost reset, Aurora expects to record a number of balance sheet adjustments in Q4 2020 to recognize market realities and to position the Company for future performance. These adjustments include previously announced fixed asset impairment charges, now expected to be up to $90 million, due to production facility rationalization, and a charge of approximately $140 million in the carrying value of certain inventory, predominantly trim, in order to align inventory on hand with near term expectations for demand. Approximately 40% of the expected inventory provision relates to the non-cash IFRS fair value adjustment within inventory. Although the business prospects for Aurora remain strong, under IFRS, management is required to recognize the impact of overall industry risk, and to consider the book value of the Company relative to current market capitalization. Accordingly, the Company expects to recognize a non-cash write-down of goodwill and intangible assets in the range of $1.6 to $1.8 billion.

45.    On this news, Aurora's stock price fell $0.99 per share, or 11.63%, to close at $7.52 per share on September 8, 2020.

46.    In the weeks following the Company's disclosure, market analysts commented on Aurora's downward trajectory and the impact of the impairment charges on the Company's decline.   For example, an article published by *MarketWatch* on September 22, 2020 indicated, in relevant part:

24

> ***Part of the decline in recent months stemmed from Aurora's admission earlier this month that it would take an impairment charge of roughly C$1.8 billion in this earnings report largely related to goodwill charges for previous acquisitions.*** In that same announcement, Aurora announced its third chief executive of 2020, Miguel Martin, who replaced interim CEO Michael Singer after Singer took over for the departed Terry Booth in February. The company also guided for fourth-quarter revenue of C$70 million to C$72 million.

(Emphasis added.)

47.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Aurora securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Aurora securities were actively traded on the NYSE and TSX.  While the exact number of Class members is

unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Aurora or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Aurora;

- whether the Individual Defendants caused Aurora to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Aurora securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

54.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Aurora securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and TSX and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Aurora securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

55.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

56.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

57.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

59.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Aurora securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Aurora securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

60.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Aurora securities.  Such reports, filings, releases and statements were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the truth about Aurora's finances and business prospects.

61.     By virtue of their positions at Aurora, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

62.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Aurora, the Individual Defendants had knowledge of the details of Aurora's internal affairs.

63.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Aurora.  As officers and/or directors of a publicly-held

company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Aurora's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Aurora securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Aurora's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Aurora securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

64. During the Class Period, Aurora securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Aurora securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions

by Plaintiff and the Class, the true value of Aurora securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Aurora securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

65.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

67.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.     During the Class Period, the Individual Defendants participated in the operation and management of Aurora, and conducted and participated, directly and indirectly, in the conduct of Aurora's business affairs.  Because of their senior

positions, they knew the adverse non-public information about Aurora's misstatement of income and expenses and false financial statements.

69.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Aurora's financial condition and results of operations, and to correct promptly any public statements issued by Aurora which had become materially false or misleading.

70.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Aurora disseminated in the marketplace during the Class Period concerning Aurora's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Aurora to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Aurora within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Aurora securities.

71.    Each of the Individual Defendants, therefore, acted as a controlling person of Aurora.  By reason of their senior management positions and/or being directors of Aurora, each of the Individual Defendants had the power to direct the

actions of, and exercised the same to cause, Aurora to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Aurora and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

72.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Aurora.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  October 2, 2020

Respectfully submitted,

POMERANTZ LLP

*/s/ Gustavo F. Bruckner*
Gustavo F. Bruckner
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Counsel for Plaintiff*

Tuesday, September 15, 2020

## Aurora (ACB)

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.  I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Aurora Cannabis Inc. ("Aurora" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Aurora securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Aurora securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Aurora securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Name**

**Print Name**

Stephen Lawless

**Signature**

1





(redacted)

**Documents & Message**

**Aurora Cannabis Inc. (ACB)**                                    **Lawless, Stephen**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 4/16/2020 | 86 | $8.0000 |